PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2430
_____

WEST RUN STUDENT HOUSING ASSOCIATES, LLC;
CAMPUS VIEW JMU, LLC; MT. TABOR VILLAGE, LLC,

Appellants

v.

HUNTINGTON NATIONAL BANK
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 12-cv-00076)
District Judge:  Honorable Terrence F. McVerry
_____

Submitted Under Third Circuit LAR 34.1(a)
February 11, 2013

Before:  HARDIMAN, and ALDISERT, *Circuit Judges*
and STARK[*], *District Judge*

_____

[*]  The Honorable Leonard P. Stark, District Judge for the

(Filed: April 4, 2013)

James R. Cooney
Robert O. Lampl
Robert O. Lampl & Associates
960 Penn Avenue
The Convention Tower, Suite 1200
Pittsburgh, PA 15222

Rudy A. Fabian
1623 Shady Avenue
Pittsburgh, PA 15217
        *Attorneys for Appellants*

Kathleen J. Goldman
Peter S. Russ
Renee M. Schwerdt
Buchanan Ingersoll & Rooney
301 Grant Street
One Oxford Centre, 20th Floor
Pittsburgh, PA 15219
        *Attorneys for Appellee*

_____

OPINION OF THE COURT
_____

United States District Court for the District of Delaware, sitting by designation.

HARDIMAN, *Circuit Judge*.

West Run Student Housing Associates, LLC (West Run), Mt. Tabor Village, LLC (Mt. Tabor), and Campus View JMU, LLC (Campus View) (collectively, Plaintiffs) appeal the District Court's order dismissing their amended complaint against Huntington National Bank. We will affirm in part, vacate in part, and remand.

I

This lawsuit arose from three commercial real estate development projects for student housing at West Virginia University (the West Run Project), Virginia Tech (the Mt. Tabor Project), and James Madison University[1] (the Campus View Project). The same group of individuals (Sponsors) sponsored each project.

A. The West Run Project

In August 2006, the Sponsors formed West Run to facilitate the construction and management of off-campus housing at West Virginia University in Morgantown, West Virginia. West Run retained CBRE/Melody, a real estate broker, for the purpose of securing bank financing for the project. CBRE/Melody provided prospective lenders with

---

[1] In the pleadings, the District Court opinion, and the appellate briefs, this university is referred to as "James Mason University." No such institution exists. The record cites a school in Harrisonburg, Virginia, where James Madison University is located.

confidential and proprietary information, consisting of "an 'underwriting,' a 'bank package,' a loan request, a front end appraisal of the project . . . , and financial information for each of the Sponsors," in conjunction with its efforts to secure bank financing. Amended Compl. ¶ 9. In September 2006, West Run selected Sky Bank to provide financing for the project, and the bank agreed to loan West Run $39.975 million. On July 1, 2007, Huntington National Bank (Huntington) became the successor-by-merger to Sky Bank's rights and obligations under the West Run loan transaction.

The West Run Project was to be constructed in two phases. Phase I was completed on schedule in August 2007. The apartments completed during that phase had an occupancy rate of 95% in the fall of 2007. Construction of Phase II was completed in August 2008.

In the fall of 2008, as the West Run Project was being completed, construction commenced on an unrelated student housing project known as the Copper Beech Townhomes (Copper Beech), located across the street from the West Run Project. By the spring of 2009, a number of the Copper Beech units were available for rent in competition with those in the West Run Project. According to the amended complaint, it was at this time that West Run first learned that "Huntington had participated, to the extent of $20 million, in the financing of Copper Beech." *Id.* ¶ 32. West Run also alleges that Huntington divulged to the Copper Beech developers the proprietary West Run information that had been provided by CBRE/Melody to Huntington's predecessor, Sky Bank.

The West Run Project's overall occupancy dropped from 95% in the fall of 2007 to 64% in the fall of 2009, which greatly

4

decreased West Run's available cash flow. Consequently, West Run anticipated that it would be unable to make the principal and interest payments due to Huntington by December 1, 2009. West Run contends that its "occupancy crisis was caused by Huntington's financing of Copper Beech, with its resulting diminishment of [the West Run Project's] revenues." *Id.* ¶ 40.

## B. The Mt. Tabor Project

In October 2007, the Sponsors formed Mt. Tabor to facilitate the construction and management of an off-campus housing project at Virginia Tech in Blacksburg, Virginia. The Mt. Tabor Project was smaller than the West Run Project, consisting of only thirty-eight condominium units. Huntington agreed to finance this development with a $6 million loan, to be disbursed in installments. The loan agreement, however, required Mt. Tabor to sell at least twenty-nine units before Huntington was required to fund the entire project. In the spring of 2009, as the project was nearing completion, Huntington refused to provide the last construction advance, and the project failed.

## C. The Campus View Project

In February 2008, the Sponsors formed Campus View to facilitate the construction and management of an off-campus housing project at James Madison University in Harrisonburg, Virginia. The Campus View Project consisted of one hundred sixty-eight condominium units to be constructed in three phases. Huntington agreed to finance the Campus View Project with a $10.5 million revolving line of credit, which was secured by a mortgage on the property. The loan agreement required Campus View to sell at least fifty-four units before Huntington was

required to fund Phase II. In or around August 2009, Huntington refused to extend further construction advances to Campus View.

## II

On December 22, 2011, Plaintiffs filed a three-count verified complaint in the Court of Common Pleas of Allegheny County, Pennsylvania. In Count I, West Run alleged that Huntington had breached its duty of good faith and fair dealing by financing the Copper Beech project. In Counts II and III, Campus View and Mt. Tabor each alleged breach of contract based on Huntington's failure to provide funds under their respective construction loan agreements.

On January 20, 2012, Huntington removed the case to the United States District Court for the Western District of Pennsylvania. A week later, Huntington filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion argued that West Run's claim (Count I) should be dismissed for failure to state a plausible claim. It also argued that Mt. Tabor's and Campus View's claims (Counts II and III) should be dismissed because the number of pre-sold condominium units listed in the complaint established that they had sold an insufficient number of units to require Huntington to disburse additional funds pursuant to the construction loan agreements.[2]

---

[2] In the original complaint, Mt. Tabor averred that it had pre-sold twenty-seven units and Campus View averred that it had pre-sold thirty-six units.

In response to Huntington's motion to dismiss, Plaintiffs filed an amended complaint, which simply omitted the factual allegations regarding the number of pre-sold units. The amended complaint also included a new count, listed as Count I, in which West Run alleged that Huntington had breached its duty of good faith and fair dealing by disclosing confidential information it had received from CBRE/Melody to the Copper Beech developers. The other counts were renumbered Counts II, III, and IV, in the same order as they originally appeared.

Huntington then filed a motion to dismiss the amended complaint, again arguing that West Run's claims should be dismissed for failure to state a plausible claim. As to the claims of Mt. Tabor and Campus View, Huntington argued that they failed to state a claim based on the admissions as to the pre-sales deficiencies contained in the original complaint.

The District Court granted the motion and dismissed the amended complaint in its entirety with prejudice. *W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 2012 WL 1739820, at *7 (W.D. Pa. May 15, 2012). This appeal followed.[3]

---

[3] The District Court exercised subject matter jurisdiction under 28 U.S.C. § 1332. We have appellate jurisdiction under 28 U.S.C. § 1291, and we exercise plenary review of a district court's dismissal order under Federal Rule of Civil Procedure 12(b)(6). *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010) (citation omitted).

## III

Plaintiffs raise three arguments on appeal: (1) the District Court erred when it concluded that West Run did not plead sufficient facts to support its allegation that Huntington provided confidential information regarding the West Run Project to the Copper Beech developers; (2) the District Court erred when it concluded that Huntington had no duty to West Run to refrain from financing Copper Beech; and (3) the District Court erred by deeming the unit pre-sale numbers listed in the superseded original complaint to be binding judicial admissions. We will examine each argument in turn.

## A

The District Court determined that West Run alleged insufficient facts to support the conclusion that Huntington provided any proprietary information regarding the West Run Project to the Copper Beech developers. We agree. To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level" and the complaining party must offer "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

Just as the complaint in *Twombly* contained only "an allegation of parallel conduct and a bare assertion of conspiracy," 550 U.S. at 556, here West Run offers no more than an allegation that confidential information was disclosed and a bare assertion that this violated the duty of good faith and fair dealing. West Run does not plead facts regarding the nature of the disclosed information, who disclosed it, or when it was

8

disclosed. Nor does the amended complaint contain any corroborating factual averments that confidential information was disclosed at all. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Accordingly, we will affirm the District Court's dismissal of Count I.

B

In Count II, West Run alleges that Huntington breached the implied duty of good faith and fair dealing by providing a loan to Copper Beech for a competing housing development near the West Run Project. The District Court dismissed this claim after observing that the loan agreement between West Run and Huntington contained no language that would bar Huntington from making loans to Copper Beech, and finding that West Run's broad conception of the implied duty of good faith and fair dealing would essentially bar Huntington from financing anyone West Run considers a competitor.

Although "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement," *Kaplan v. Cablevision of PA, Inc.*, 671 A.2d 716, 722 (Pa. Super. Ct. 1996) (quoting Restatement (Second) of Contracts, § 205) (internal quotation marks omitted), that duty is not limitless. Rather, there must be some relationship to the provisions of the contract itself to invoke the duty of good faith. *See id.* at 721–22; *Agrecycle, Inc. v. City of Pittsburgh*, 783 A.2d 863, 867 (Pa. Commw. Ct. 2001) ("The good faith obligation may be implied to allow enforcement of the contract terms in a manner that is consistent with the parties' reasonable

9

expectations."). Otherwise, the court would violate the axiom that it "not imply a different contract than that which the parties have expressly adopted." *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 388 (Pa. 1986). In other words, the duty of good faith and fair dealing does not license courts to interpose contractual terms to which the parties never assented.

In this case, we agree with the District Court that the implied duty of good faith and fair dealing did not extend as far as Plaintiffs suggest. West Run argues for a duty of good faith external to its contract with Huntington. Pennsylvania courts have rejected such attempts to rewrite a contract. *See, e.g.*, *Kaplan*, 671 A.2d at 721–22 (defendant cable companies did not breach the duty of good faith and fair dealing by allegedly providing "insufficient, confusing and misleading representations regarding the subscribers' right to credit for service interruptions" because the cable companies "were not contractually bound to provide such service or credit and . . . made no representations regarding the right to such credits"). We do likewise and hold that the District Court did not err when it dismissed Count II.

C

Plaintiffs' final argument is that the District Court erred by deeming pre-sale numbers in the original complaint to be binding judicial admissions, notwithstanding the fact that the original complaint had been superseded by an amended complaint.

The loan agreements at issue explicitly conditioned Huntington's obligation to fund construction advances upon Mt. Tabor and Campus View achieving a certain level of pre-sold

10

condominium units. In the original complaint, Mt. Tabor averred that it had pre-sold twenty-seven units and Campus View averred that it had pre-sold thirty-six units. Because the number of units listed in the original complaint was insufficient to trigger Huntington's obligation to fund the loans, Huntington moved to dismiss. In response, Plaintiffs filed an amended complaint that omitted those pre-sale averments after they "realiz[ed] that the presale numbers in the original Complaint were in error." Appellants' Br. 26. Thereafter, Huntington filed another motion to dismiss, contending that the District Court should accept the averments in the original complaint as judicial admissions. The District Court agreed and granted the motion. As we shall explain, the District Court erred given the procedural posture of the case.

Rule 15(a) of the Federal Rules of Civil Procedure allows a party to amend its pleading once as a matter of course within 21 days after serving it or within 21 days after service of a responsive pleading. Fed. R. Civ. P. 15(a). "[T]he amended complaint 'supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading.'" *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1504 (3d Cir. 1996) (quoting *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985)). This approach "ensures that a particular claim will be decided on the merits rather than on technicalities." *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990); *see also* 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1474 (3d ed. 2008) ("A liberal policy toward allowing amendments to correct errors in the pleadings clearly is desirable and furthers one of the basic objectives of the federal rules—the determination of cases on their merits.").

Although the District Court acknowledged these principles, it reasoned that "a plaintiff is not permitted to take a contrary position in a complaint in order to avoid dismissal." *W. Run*, 2012 WL 1739820, at *6. The District Court relied on two of our decisions for this proposition: *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 181 (3d Cir. 2008), and *Parilla v. IAP Worldwide Servs. VI, Inc.*, 368 F.3d 269, 275 (3d Cir. 2004). *See W. Run*, 2012 WL 1739820, at *6. But neither of those decisions involved the question of whether a plaintiff could *amend* a complaint to cure a purported factual mistake. In *Sovereign Bank*, a party attempted to take a legal position on appeal that was contradicted by an allegation in its complaint, and we held that the allegation was a binding judicial admission. *See Sovereign Bank*, 533 F.3d at 181. In *Parilla*, we denied the appellee's motion to dismiss an appeal for lack of standing because, *inter alia*, factual concessions in her own complaint revealed the basis for appellants' standing. *See Parilla*, 368 F.3d at 275.

Even if Plaintiffs' allegations in the original complaint constituted judicial admissions, it does not follow that they may not amend them. This Court and several of our sister courts have recognized that judicial admissions may be withdrawn by amendment. *See Giannone v. U.S. Steel Corp.*, 238 F.2d 544, 547 (3d Cir. 1956) (recognizing that "withdrawn or superseded pleadings" do not constitute judicial admissions); *see also, e.g.*, *InterGen N.V. v. Grina*, 344 F.3d 134, 144–45 (1st Cir. 2003) ("An amended complaint supersedes the original complaint, and facts that are neither repeated nor otherwise incorporated into the amended complaint no longer bind the pleader."); *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002) ("When a party has amended a pleading, allegations and statements in earlier pleadings are not considered judicial admissions."); *Huey*

12

*v. Honeywell, Inc.*, 82 F.3d 327, 333 (9th Cir. 1996) ("When a pleading is amended or withdrawn, the superseded portion ceases to be a conclusive judicial admission . . . ." (citation and internal quotation marks omitted)); *Hibernia Nat'l Bank v. Carner*, 997 F.2d 94, 101 (5th Cir. 1993) ("To the extent that Hibernia did make a 'judicial confession[]' [in its original complaint,] that confession was amended away." (citations omitted)). Indeed, effectively disallowing amendment by looking to the original pleading is contrary to the liberal amendment policy embodied in Rule 15.

Nor was dismissal warranted because Plaintiffs sought to "take a contrary position . . . to avoid dismissal." *W. Run*, 2012 WL 1739820, at *6. Plaintiffs routinely amend complaints to correct factual inadequacies in response to a motion to dismiss. *See* 6 Wright & Miller, *supra* § 1474 ("Perhaps the most common use of Rule 15(a) is by a party seeking to amend in order to cure a defective pleading."). That is so even when the proposed amendment flatly contradicts the initial allegation. *See, e.g.*, *188 LLC*, 300 F.3d at 734–36 (noting that district court permitted plaintiff to amend complaint to assert a contradictory factual position in response to a Rule 12(b)(6) motion and holding that earlier allegation was no longer a binding judicial admission in light of that amendment); *cf. Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 612 (10th Cir. 1988) (noting that ADEA plaintiff amended his complaint as of right in response to motion to dismiss to "change[] the date of the alleged discriminatory action" for statute of limitations purposes, "ma[king] the filing of the discrimination charge timely under the pleadings").

We find the Seventh Circuit's decision in *Kelley v. Crosfield Catalysts*, 135 F.3d 1202 (7th Cir. 1998), particularly

13

instructive because it considered the question presented in this appeal under nearly identical procedural circumstances. In *Kelley*, the plaintiff filed a Family and Medical Leave Act (FMLA) action against his employer. He alleged in his complaint that he had been fired because he took leave from work to "obtain custody of [his] kids." *Id.* at 1203. The employer filed a Rule 12(b)(6) motion to dismiss, arguing that seeking custody of one's own children was not covered by the FMLA. *Id.* The plaintiff later filed an amended complaint that omitted that assertion. *Id.* The employer again moved to dismiss, arguing that the admissions contained in the original complaint were binding. *Id.* at 1203–04. The district court granted the motion. *Id.* at 1204.

The Seventh Circuit reversed. It first noted that "[i]t is well-established that an amended pleading supersedes the original pleading; facts not incorporated into the amended pleading are considered *functus officio*." *Id.* It then explained that "[i]f certain facts or admissions from the original complaint become *functus officio*, they cannot be considered by the court on a motion to dismiss the amended complaint. A court cannot resuscitate these facts when assessing whether the amended complaint states a viable claim." *Id.* at 1205. Applying these principles, the court concluded:

> Any facts that Kelley had pleaded in his first two complaints were effectively nullified for 12(b)(6) purposes when he filed his Second Amended Complaint, which did not reference those facts. There was no longer any "confession" in the pleadings on which the district court could rely when reviewing Crosfield's motion to dismiss the Second Amended Complaint.

14

*Id.* This approach is consistent with how other courts of appeals have treated the issue. *See, e.g.*, *InterGen*, 344 F.3d at 144–45; *Huey*, 82 F.3d at 333; *Hibernia Nat'l Bank*, 997 F.2d at 101.

This is not to say, however, that a party's assertion of contrary factual positions in the pleadings is without consequence. A superseded pleading may be offered as evidence rebutting a subsequent contrary assertion. *See Giannone*, 238 F.2d at 547; *see also InterGen*, 344 F.3d at 144–45; *188 LLC*, 300 F.3d at 736; *Huey*, 82 F.3d at 333; *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989); *Raulie v. United States*, 400 F.2d 487, 526 (10th Cir. 1968). For example, at the summary judgment stage, a district court may consider a statement or allegation in a superseded complaint as rebuttable evidence when determining whether summary judgment is proper. *See 188 LLC*, 300 F.3d at 735–36. However, at the motion to dismiss stage, when the district court typically may not look outside the four corners of the amended complaint, the plaintiff cannot be bound by allegations in the superseded complaint.

Applying these principles to this appeal, the District Court was required to convert Huntington's motion to dismiss into a motion for summary judgment before looking beyond the amended complaint to the pre-sale numbers contained in the original complaint. *See Kelley*, 135 F.3d at 1204. We will vacate and remand so the District Court can give Plaintiffs a chance to provide evidence showing that the pre-sale numbers in the original complaint were incorrect (as they now claim) and

15

that the real numbers meet the contractual requirements.[4]

IV

For the foregoing reasons, we will affirm the District Court with respect to its dismissal of Counts I and II of the amended complaint, and we will vacate and remand with respect to Counts III and IV.

---

[4] We note that the original complaint, filed in state court, was verified as true and correct under penalty of perjury by Russell P. Mills, the manager of West Run. Although the fact that the original complaint was verified does not alter the principle that an amended complaint will supersede the original, *see King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam), that verification places a heavy burden on Plaintiffs to explain why the number of pre-sold units was incorrect.

We also note that although complaints filed in federal court are usually not verified by the parties, Rule 11 of the Federal Rules of Civil Procedure requires an attorney to certify that a pleading "is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation" and that "the factual contentions have evidentiary support." Fed. R. Civ. P. 11(b)(1), (3).